# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Advanced Biocide Technologies, LLC,
a Florida Limited Liability company,

CASE NO.:

                 Plaintiffs,

v.

Jacqueline Kemper, an individual,
Granite Ridge Consulting LLC,
an Arizona limited liability company, and
Kemper Consulting LLC.,
an Arizona limited liability company

                 Defendants.            /

## **COMPLAINT**

Plaintiff, Advanced Biocide Technologies, LLC., a Florida limited liability company,

("**Plaintiff**" or "**ABT**"), hereby sues Defendants, Jacqueline Kemper ("**KEMPER**"), an

individual, Granite Ridge Consulting LLC, an Arizona limited liability company ("**GRANITE**"),

and Kemper Consulting LLC., an Arizona limited liability company ("**K-CONSULTING**")

(collectively "Defendants") for (a) breach of contract; (b) breach of fiduciary duty; (c)

misappropriation of trade secrets under Florida's Uniform Trade Secrets Act ("**FUTSA**"), Fla.

Stat. §688.001, et seq.; (d) unfair competition; (e) violations of Florida's Deceptive and Unfair

Trade Practices Act ("**FDUTPA**"), Fla. Stat. §501.201 et seq.; (f) conversion of tangible property

owned by ABT; and (g) conversion of stored electronic data. In support of its claims, Plaintiff

alleges as follows:

1

**JURISDICTION AND VENUE**

1.      This Court has jurisdiction of this matter under 28 U.S.C. §§ 1332 because ABT operates a business in this Judicial District (Sunrise, FL), Defendant KEMPER resides in Arizona and is a citizen of that State, Defendant corporations, GRANITE and K-CONSULTING, are Arizona companies, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

2.      KEMPER is subject to personal jurisdiction in this Judicial District (South Florida), because KEMPER signed a contract with ABT, the Mutual Confidentiality, Non-Circumvention and Non-Disclosure Agreement ("**Agreement**")(attached as Exhibit F), providing that any lawsuit to enforce the Agreement "shall be brought" in the State of Florida. Further, for several years, KEMPER delivered consulting services to ABT in this State. KEMPER was Senior Vice-President of ABT and owed ABT certain fiduciary responsibilities under Florida law. KEMPER, as ABT's V-P, abused her V-P's position and breached her duties to ABT in the State of Florida. Additionally, as alleged herein, KEMPER misappropriated trade secrets and confidential data from ABT's offices and computer systems which reside in or operate in this State. Finally, ABT, as a citizen of Florida, has been seriously injured in this State by the complained-of acts by KEMPER.

3.      Defendant corporations, GRANITE and K-CONSULTING, upon information and belief, are subject personal jurisdiction in this Judicial District (South Florida), because KEMPER used GRANITE and K-CONSULTING to misappropriate ABT's trade secrets and

confidential data from ABT's offices and computer systems which reside in or operate in this State. Also, upon information and belief, GRANITE and K-CONSULTING, under the control and direction of KEMPER, engaged in multiple acts of unfair competition and multiple violations of the FDUTPA, all directed to and involving ABT in this State. Finally, ABT, as a citizen of Florida, has been seriously injured by the complained-of acts by Defendant corporations in this State.

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and (3) because a substantial part of the events or omissions giving rise to these claims against Defendants occurred in this Judicial District, a substantial part of the intangible property, that is the subject of the action, is situated in this Judicial District, and a substantial part of tangible property that is the subject of the action is owned by ABT, who resides in this Judicial District. Under the facts set forth in this complaint, venue is proper in this Judicial District due to Defendants' actions and the situs of the property.

5.      All conditions precedent to the filing of this action have occurred or have been waived or excused by law.

## **<u>PLAINTIFF</u>**

6.      Plaintiff, ADVANCED BIOCIDE TECHNOLOGIES, LLC., a Florida limited liability company, ("**<u>Plaintiff</u>**" or "**<u>ABT</u>**") has its principal place of business in Sunrise, Fl. ABT is owned and controlled by Alexander Benisti ("**<u>BENISTI</u>**").

7.      BENISTI also owns and controls Int'l Capital Investment, LLC, d/b/a

International Capital Investment, a Delaware limited liability company (herein "**ICI**"). ICI was formed in 2013. ICI is the patent owner (discussed later) and ABT is the commercial entity, controlled by BENISTI, exploiting the inventive technology.

8.      ABT's corporate predecessor is Globalex USA, Inc., a Delaware corporation ("**GLOBALEX**"), which changed its corporate name to "Advanced Biocide Technologies, Inc.," on August 18, 2015. See Exhibit A, attached (this Delaware company referred to as "**GLOBALEX/ABT**" herein). BENISTI incorporated GLOBALEX in 2014 and owned and operated that company until GLOBALEX/ABT transferred its assets and business to Plaintiff, ADVANCED BIOCIDE TECHNOLOGIES, LLC. (herein "**ABT**") in 2016. See Exhibit B.

9.      ABT is a biotech company. In 2014, ABT's predecessors developed and then began selling in 2015 its BIOTAB7 product, an antimicrobial soluble tablet which, when dissolved in water, provides hospital grade sterilization and disinfection solution in as little as 60 seconds. As a disinfectant, BIOTAB7 is an antimicrobial which destroys germs, viruses, bacteria, algaes, and fungi. As a biocide, BIOTAB7 destroys disease causing microorganisms and transmissible agents. As a deodorizer, BIOTAB7 kills odor-causing bacterial microorganisms in the air, leaving it smelling fresh. As a cleaner, BIOTAB7 creates potable drinking water without chemical fumes, toxic ingredients, or by-products. Exhibit C, attached, is the manufacturer's data sheet for the BIOTAB7 product, ABT's MSDS or Material Safety Data Sheet.

10.      On August 6, 2015, BENISTI, ABT's founder, filed a provisional patent application in the U.S. Patent and Trademark Office (USPTO), assigned serial no. 62/201,787, related to a disinfectant for drinkable water, food contact, industry, spas, swimming pools and air.

4

On August 5, 2016, BENISTI filed an international patent application with the World Intellectual Property Office (WIPO)(serial no. PCT/US2016/045847) for his invention entitled "Disinfectant For Drinkable Water, Food Contact, Industry, Spas, Swimming Pools and Air Sterilization," designating the United States, which international patent application was published on February 9, 2017, as WIPO Publication Number WO/2017/024251. See Exhibit D. Later, on January 24, 2018, BENISTI filed a follow-on, related U.S. patent application in the USPTO, serial no. 15/747,394 for the identical Disinfectant Patent (herein these patent filings are collectively referred to as the "**Invention**"). Both the earlier filed U.S. provisional '787 patent application, the WIPO '251 application, and the later filed non-provisional U.S. '394 application describe the Invention and, under the U.S. Patent Act and international treaties, are related to each other in that the currently pending, U.S. '394 application claims the benefit of the earlier filed WIPO '251 application and the U.S. '787 provisional application. BENISTI assigned the Invention to ICI, doing business as "International Capital Investment, LLC", a company owned and controlled by BENSITI. ICI is the patent owner and ABT is the commercial entity, controlled by BENISTI, exploiting the technology and the Invention.

11. The Patent Act and international treaties require that the Invention in these patent applications remain secret for a certain period of time. Details of the Invention were first made public by WIPO on February 9, 2017, with WIPO Publication Number WO/2017/024251 (attached as Exhibit D). Hence, the Invention remained a trade secret of ABT and its predecessors from 2015 to February 9, 2017.

12.     ABT's BIOTAB7 product represents a commercial version of the Invention in this series of patent applications.

13.     BENISTI substantially completed the development of the BIOTAB7 Invention in 2014 before KEMPER was hired by GLOBALEX/ABT on November 2014. In 2015, GLOBALEX/ABT began selling BIOTAB7.

14.     In January 2014, KEMPER was hired by GLOBALEX/ABT. Shortly thereafter, she signed an Independent Contractor Nondisclosure Agreement with that Delaware company, the predecessor of Plaintiff ABT. See Exhibit E, attached.

## **DEFENDANTS**

15.     Defendant, Jacqueline Kemper ("**KEMPER**"), an individual, Granite Ridge Consulting LLC, an Arizona limited liability company ("**GRANITE**"), and Kemper Consulting LLC., an Arizona limited liability company ("**K-CONSULTING**"), upon information and belief either resides at or conducts business at 2582 W. Kit Carson Trail, Anthem, AZ 85086. KEMPER owns and operates GRANITE and K-CONSULTING, which are Arizona companies.

16.     From July 2015 through June 2019, ABT and its corporate predecessors rented a portion of KEMPER's residence at 2466 N. Redington Place, Tucson, AZ 85749 as its Arizona office.

17.     Upon information and belief, GRANITE has a principal place of business at 2582 W. Kit Carson Trail, Anthem, AZ 85086. GRANITE was incorporated on September 23, 2020.

18.     As explained on its current corporate website, GRANITE "provides regulatory guidance for chemical manufacturers and distributors for EPA regulated products, devices under

FDA regulation and international product registrations. We go beyond your regulatory needs, providing marketing, sales and business acumen and connecting you with private label clients, governments and investors within our network." See <https:// graniteridgeconsulting.com>.

19.     Upon information and belief, K-CONSULTING has a principal place of business at 2582 W. Kit Carson Trail, Anthem, AZ 85086. K-CONSULTING was incorporated on July 5, 2018.

20.     Upon information and belief, Defendants actions involved interstate commerce in connection with their misappropriation of ABT's trade secrets and confidential information in violation of the FUTSA, engaged in acts of unfair competition using means and methods of interstate commerce, violated the FDUTPA, and converted certain tangible property of ABT. These interstate acts involved, upon information and belief, providing ABT's trade secrets and confidential information to third party corporations located outside Florida and Arizona, and engaging in acts of unfair competition across state lines with third party corporations.

## FACTS COMMON TO ALL COUNTS

21.     In 2014, ABT, through its corporate predecessor, GLOBALEX/ABT, substantially completed its development of the BIOTAB7 product.

22.     In November 2014, GLOBALEX/ABT hired KEMPER as an independent consultant.

23.     On January 26, 2015, KEMPER signed GLOBALEX/ABT's Independent Contractor Nondisclosure Agreement on (the "**2015 NDA**"), Exhibit E, attached.

24.     Prior to being hired by GLOBALEX/ABT, upon information and belief, KEMPER was employed, on a part time basis, as a home organizer and a part-time car salesperson.

25.     When hired, upon information and belief, KEMPER had no experience in the chemical industry, no EPA experience, and no regulatory experience dealing with state registrations of chemical products. Upon information and belief, KEMPER also had no experience or knowledge about labeling requirements and warnings regarding use and handling of chemical products.

26.     From 2014 through 2016, GLOBALEX/ABT and BENISTI trained KEMPER regarding regulatory issues involving the BIOTAB7 product, namely, EPA labeling, warning and usage instructions for the BIOTAB7 product, state registrations for the BIOTAB7 product, and, in general the regulatory structure in the chemical industry.

27.     Kemper has always been paid as an independent consultant by ABT and ABT's predecessor companies. When initially hired, KEMPER was paid about $1,000 per month. At the time KEMPER was terminated in January 2020, she was paid about $5,500 per month in addition to fringe benefits provided by ABT such as a car and a business expense account for ABT's business related expenses.

28.     During 2014 – 2016, KEMPER was progressively exposed to all aspects of GLOBALEX/ABT's business, such as manufacturing, marketing, sales, and distribution of the BIOTAB7 product, including product registration. Effectively, BENISTI was training KEMPER to be a high-level manager for ABT.

29.     During her tenure at ABT (2014-2020), BENSITI shared considerable confidential corporate information with KEMPER. This information included manufacturing data for the ABT product, manufacturer and vendor data, business plans, marketing plans (to exploit ABT's product in certain industrial, commercial and consumer markets), identification of prospective customers in those market segments, customer relations, and ultimately access to customer lists and contacts.

30.     GLOBALEX/ABT initially relied upon the 2015 NDA to maintain corporate information as confidential. Its computers had password controls for confidential information. BENISTI trained KEMPER that much of this data was confidential and should not be shared with outsiders. Her job and ABT's success relied upon (a) keeping manufacturing data for BIOTAB7 a secret; (b) maintaining the confidential nature of manufacturer and vendor data; (c) keeping secret its business plans and marketing plans that were the keys to ABT's success because these plans permitted the company to exploit BIOTAB7 in various industrial, commercial and consumer markets; (d) continual identification, cultivation and development of prospective customers in those market segments coupled with the need to keep that data in-house and away from the competition, resulted in future business; and (e) keeping secret customer confidences resulted in maintaining good customer relations, customer lists and updating contacts.

31.     This compilation of confidential corporate data was stored on ABT's computer system which always had password access controls limiting information to key ABT personnel.

32.     As an example of her professional development, in an internal company email dated February 2019, KEMPER described her duties at ABT as: working with the EPA to upgrade ABT product's labeling to include an extended shelf life; using CASE (Consulting Laboratories, Inc.)

for analytic analysis of the ABT product; reworking the ABT product stability label; seeking an EPA amendment for the product, updating the product's EPA 2019 Amendment data; overseeing food-contact sanitizer for BIOTAB7 efficacious at below 57 ppm; and engaging the University of Arizona or MicroChem for a GLP toxic studies of the ABT product. See KEMPER email, Exhibit G, attached.

33.     In August 2016, Plaintiff, Advanced Biocide Technologies, LLC ("**ABT**"), was formed as a Florida limited liability company. See Exhibit B. Upon formation of ABT in Florida, GLOBALEX/ABT (the predecessor Delaware company) transferred and assigned its biotech business to Plaintiff ABT, the Florida limited liability company.

34.     In 2016, KEMPER was prompted and became ABT's Senior Vice President. See ABT's Florida corporate records, Exhibit B, at pg. 2.

35.     In May 2017, commensurate with her expanded responsibilities, KEMPER signed ABT's Mutual Confidentiality, Non-Circumvention and Non-Disclosure Agreement (the "**2017 NDA**"). See Exhibit F, attached.

36.     KEMPER signed the 2017 NDA as Senior V-P of ABT, thereby affirming that she was an officer of ABT.

37.     Unfortunately, during 2017 – 2019, BENISTI became gravely ill, suffering a series of heart related ailments.

38.     Although BENISTI often consulted with KEMPER during his period of disability, KEMPER effectively took over the day-to-day operations of ABT and management of ABT. During this time, KEMPER had full and unfettered access to all ABT confidential corporate data.

39.    The 2017 NDA recognizes that KEMPER and ABT wanted to share certain confidential, technical and business information for a business opportunity of mutual interest. That business was the operation and management of ABT.

40.    The 2017 NDA has a broad definition of "confidential information" (effectively a laundry list), covering, inter alia: (a) BIOTAB7 product development, chemical composition and analysis, BIOTAB7's efficacy, BIOTAB7's industrial applications, specific manufacturing specifications and processing data (herein "**product development data**"); (b) manufacturing issues, problems, solutions, and packaging (herein "**manufacturing data**"); (c) product testing data including efficacy, storage, shelf-life, labeling, regulatory requirements, and industrial applications (herein "**testing data**"); (d) the pre-publication patent data for the BIOTAB7 Invention (herein "**patent data**"); (e) contact data for ABT's supplier(s) hired to develop and manufacture BIOTAB7 (e.g., supplier name, address, principal contact, email, instructions to manufacture, pricing, delivery times, etc.)(herein "**supplier data**"); (f) identification of target markets, marketing materials, sales projections and regulatory compliance associated with BIOTAB7 sales (herein "**marketing data**"); (g) BIOTAB7 pricing structure, commercialization roll-out data, and pricing for target markets (herein "**pricing data**"); and (h) contact data for ABT's customers, both current customers and prospective customers (herein "**customer data**"). While KEMPER was working for ABT, she selected and used passwords permitting her to register the BIOTAB7 product with the federal government (namely, the EPA), and various state, city and county regulatory agencies. She also selected and used passwords for other business purposes, such as accessing ABT's computers, ABT supplied cell phones, travel accounts, control of ABT's

website and social media accounts, email accounts, merchant and credit card processing accounts, and bank accounts (these password access controls collectively referred to herein as the "**Passwords**"). These Passwords are confidential data owned by ABT in that they control access to ABT's electronically stored confidential information.

41.    In a similar manner to its corporate predecessors, ABT treats this confidential information as a trade secret by employing reasonable efforts to maintain this information as being secret, to wit, not being or becoming generally known or ascertainable (e.g., using passwords for ABT's computers, using non-disclosure agreements, and reliance upon promises of confidentiality by ABT's consultants and salespersons). In her February 2019 email, KEMPER promised to maintain ABT's confidential information as a trade secret. See Exhibit G, attached. This confidential information is a valuable asset of ABT.

42.    The 2017 NDA covers both ABT, its corporate predecessor GLOBEALEX/ABT, and patent owner ICI because the 2017 NDA has an "affiliate clause" broad enough to cover these entities.

43.    The 2017 NDA obligates KEMPER not to use confidential information for her own benefit, not to use such information for "any purpose" (except to engage in discussions with the parties to the Agreement), and not to disclose such information to third parties (see "Non-use and Non-disclosure" Clause). Also, the 2017 NDA obligates KEMPER to maintain the secrecy of such information and "prevent the disclosure and unauthorized use" of the same. See "Maintenance of Confidentiality" Clause.

44.     The 2017 NDA obligates KEMPER "not [to] compete in like type activities with" ABT (see "Non-Competition" Clause).

45.     In the 2017 NDA, KEMPER acknowledged that ABT was the exclusive owner of this confidential information (see "Ownership" Clause).

46.     KEMPER signed the 2017 NDA as ABT's Senior V-P. The 2016 Florida corporate records list KEMPER as ABT's V-P. See Exhibit B. In that V-P position, KEMPER owed ABT a fiduciary duty of loyalty to ABT and a duty of care to support ABT's business under Florida law. The duty of loyalty prohibits self-serving by a corporate officer regarding outside business opportunities and prohibits KEMPER from taking an interest in property in opposition to ABT.

47.     KEMPER had access to ABT's confidential information from 2014 through her termination as a consultant and ABT V-P on January 2, 2020. See Exhibit H, attached.

48.     Upon information and belief, sometime during the time frame of 2018 – 2020, KEMPER, individually or through GRANITE or K-CONSULTING, used ABT's confidential information for her and her companies' own benefit and disclosed the same to other third parties. Upon information and belief, this disclosure was made to at least one competitor of ABT, Dutrion. Upon information and belief, this information included product development data; manufacturing data; testing data; pre-publication patent data; supplier data; marketing data; pricing data; and customer data. Upon information and belief, this disclosure was made to Dutrion, a direct competitor of ABT. Upon information and belief, KEMPER, GRANITE or K-CONSULTING were compensated for this disclosure and misappropriation of ABT's trade secrets.

49.     Upon information and belief, KEMPER, individually or through GRANITE or K-CONSULTING, used ABT's customer data for their own benefit and caused at least seven (7) customers of ABT to begin working with one or more competitors of ABT. Three (3) diverted commercial customers had purchased ABT product and four (4) diverted educational institutions had either purchased or expressed an interest in purchasing ABT product. Upon information and belief, KEMPER, GRANITE or K-CONSULTING were compensated for this diversion of customer accounts.

50.     Upon information and belief, KEMPER, individually or through GRANITE or K-CONSULTING, contacted ABT's supplier, using ABT's confidential supplier data. Upon information and belief, KEMPER used ABT's pricing data, and arranged or attempted to arrange that ABT's supplier make product and ship product to at least one ABT competitor. Upon information and belief, KEMPER, GRANITE or K-CONSULTING were compensated for this disclosure and interference with ABT's supplier.

51.     Upon information and belief, KEMPER, individually or through GRANITE or K-CONSULTING, prior to the patent publication of the Invention on February 9, 2017 (see Exhibit D), disclosed the then-secret product data to a competitor of ABT. This secret, pre-publication Invention data generally included target market data, product efficacy in certain industrial applications, the circa 2015 method of making and method of using the Invention, the circa 2015 chemical formula for the product, and the circa 2015 chemical analytics of the product. Upon information and belief, this data was disclosed to one or more competitors of ABT by KEMPER and the Corporate Defendants. Upon information and belief, as a result of this disclosure of pre-

14

publication Invention data, ABT's competitors had a jump start on the market to either produce a competitive product or produce a substitute product. Upon information and belief, KEMPER, GRANITE or K-CONSULTING were compensated for this disclosure of pre-2017, secret Invention data.

52.    Upon information and belief, KEMPER, individually or through GRANITE or K-CONSULTING, disclosed ABT's confidential product development data and manufacturing data. KEMPER had extensive and intimate knowledge of this confidential product development data and manufacturing data during her tenure at ABT and when she was V-P. Upon information and belief, KEMPER, GRANITE or K-CONSULTING were compensated for this disclosure of the Invention.

53.    From 2014 through 2019, ABT and its corporate predecessors purchased certain telescope-operating computer equipment, software, hardware and cabling; a semi-precious Mexican wood desk, and a car.   These tangible items were placed in the care and custody of KEMPER. The car is co-owned by ABT (titled through BENISTI) and KEMPER.

54.    ABT has demanded that KEMPER return this property. ABT and BENISTI hired a cross-country automobile transport company to retrieve the car but KEMPER refused to release the car to the transport company. See Exhibit H detailing some property retained by KEMPER and hence converted by KEMPER. KEMPER has refused to return this tangible property to ABT without justification. Upon information and belief, KEMPER continues to possess certain tangible property in contravention of ABT's possessory rights. KEMPER has not returned all tangible property owned by ABT, thereby dispossessing ABT and converting these items. Since KEMPER

controls the corporate Defendants, KEMPER, GRANITE and K-CONSULTING converted ABT's tangible property.

55.     While KEMPER was ABT's V-P, she was provided with a number of laptop computers and a cell phone (more accurately, multiple iPhones were provided to KEMPER, generally on an annual basis). These computers and cell phones in KEMPER's possession (herein "**Electronic Devices**") were used to store and process ABT's confidential information electronic data (herein "**Electronic Confidential Data**"). Upon information and belief, iPhone currently used by KEMPER but supplied by ABT (an Electronic Device) continues to store ABT's Electronic Confidential Data. While KEMPER was ABT's V-P, she used these password-controlled Electronic Devices in connection with all phases of ABT's business. These Passwords maintain the secret status of ABT's Electronic Confidential Data.

56.     On December 9, 2020, ABT demanded that KEMPER return Passwords associated with the EPA's web-based portal permitting access to ABT's EPA product registration data for BIOTAB7. See Exhibit I, attached. In a responsive email, KEMPER states that all the Passwords were on the 2019 Spreadsheet. See Exhibit J, attached. Earlier in 2020, the EPA refused ABT's request to electronically access ABT's product registration data that had been processed by in 2016 and 2019 by KEMPER. ABT had demanded that KEMPER return the Electronic Devices. See Exhibit H, referencing ABT files. Although she returned two laptops (an ASUS laptop and an HP laptop), she wiped clean and deleted all data from these laptops before returning this tangible property. The deletion of data from these laptops destroyed ABT Electronic Confidential Data.

57.     By not providing Passwords to ABT after her termination on January 1, 2020 and not returning the ABT-supplied iPhone, KEMPER deprived ABT of its use of: (a) Electronic Confidential Data stored on the Electronic Devices; and (b) Passwords permitting ABT to access its electronic assets provided on other password-controlled electronic services or platforms, such as the GoDaddy hosted website service, on social media account platforms, on state and federal government agency platforms, and other ABT vendor platforms (airlines, banks, credit card processors, etc.). By not providing the EPA Passwords after the December 9 demand, KEMPER deprived ABT of its use of its Electronic Confidential Data and its electronic submission data on the EPA web-based platform. This deprivation of ABT's EPA electronic registration data caused damage to ABT because ABT was forced to delay amending its EPA submissions and expand its approved product usage data (i.e., expanding its market penetration for Biotab7).

58.     In an email on December 9 (Exhibit J), KEMPER responded to ABT's demand letter (Exhibit I) and stated that (a) all the Passwords were listed on her earlier 2019 Password Spreadsheet; and (b) she has no data files. KEMPER has not returned all the Passwords nor the iPhone (which stores Electronic Confidential Data), thereby dispossessing ABT and converting these items. By deleting data from the ASUS and HP laptops, KEMPER has converted ABT's Electronic Confidential Data because she dispossessed ABT of this data. Since KEMPER controls the corporate Defendants, KEMPER, GRANITE and K-CONSULTING converted the Electronic Devices, Electronic Confidential Data, and Passwords.

59.     Due to the complained-of acts by KEMPER, GRANITE and K-CONSULTING, upon information and belief, ABT has been monetarily damaged in excess of $100,000. Upon

information and belief, ABT's damage arises from lost sales, disruption of its supply chain, disruption of its product testing processing plans, inability to exploit identified markets due to delays in regulatory approvals, loss of use of tangible items, that is, converting these tangible items to their own use not returning the same after demands by ABT, and loss of use of ABT's Electronic Confidential Data.

60.     Due to the complained-of acts by KEMPER, GRANITE and K-CONSULTING, upon information and belief, ABT has been irreparably harmed in that it cannot adequately be compensated for damages resulting from lost market share, diminution in pricing due to price wars with one or more competitors, delayed entry into certain markets due to delays in regulatory approvals of product and labeling, and tarnished reputation in the marketplace.

61.     ABT has retained the legal services of undersigned counsel to enforce these contractual, statutory and common law violations.

### BREACH OF CONTRACT BY KEMPER - Count I

62.     ABT repeats, re-alleges, and incorporates herein by reference as though fully set forth, all allegations contained in complaint Paragraphs 1 through 61, above.

63.     KEMPER initially signed the 2015 NDA soon after she was hired by GLOBALEX/ABT (Exhibit E) and signed a second Mutual Confidentiality, Non-Circumvention and Non-Disclosure Agreement (Exhibit F, the 2017 NDA) in May, 2017.

64.     Pursuant to the 2017 NDA, KEMPER was obligated to not to use confidential information for her own benefit, not to use such information for "any purpose" other than to further the business of ABT, not to disclose such information to third parties ("Non-use and Non-

18

disclosure" Clause) and was obligated to maintain the secrecy of such information and "prevent the disclosure and unauthorized use" of the same. See "Maintenance of Confidentiality" Clause.

65.     KEMPER breached the 2017 NDA and her obligations under the Non-use and Non-disclosure Clause and the Maintenance of Confidentiality Clause as alleged above.

66.     Pursuant to the 2017 NDA, KEMPER was obligated "not compete in like type activities with" ABT in the Non-Competition Clause.

67.     KEMPER breached the 2017 NDA and her obligation under the Non-Competition Clause as alleged above.

68.     ABT has been monetarily damaged by the complained-of acts of KEMPER.

69.     ABT has been irreparably harmed in that it cannot adequately be compensated for damages resulting from lost market share, diminution in pricing due to price wars with one or more competitors, delayed entry into certain distinct markets due to delays in regulatory approvals of product and labeling, and tarnished reputation in the marketplace.

70.     The 2017 NDA Remedies Clause recognizes irreparable harm and provides that KEMPER "acknowledges that any violation … of this Agreement by [KEMPER] will cause irreparable injury, entitling [ABT] to obtain injunctive relief in addition to all legal remedies."

71.     WHEREFORE, ABT seeks compensatory and consequential damages against KEMPER for breach, equitable relief in the form of disgorgement of all revenues and compensation received by KEMPER associated with this breach, and injunctive relief against KEMPER for breach of 2017 NDA.

## BREACH OF FIDUCIARY DUTIES BY KEMPER - Count II

72. ABT repeats, re-alleges, and incorporates herein by reference as though fully set forth, all allegations contained in complaint Paragraphs 1 through 61, above.

73. In 2016 ABT and BENISTI appointed KEMPER to be Senior V-P of ABT. KEMPER accepted the responsibilities of V-P of ABT. See ABT's corporate records, Exhibit B, and see also the 2017 NDA, Exhibit F.

74. While in that V-P position, KEMPER acknowledged in May 2017 that she was Senior V-P of ABT. See 2017 NDA, Exhibit F.

75. As V-P, KEMPER owed ABT certain fiduciary duties, such as the duty of loyalty and the duty of care under Florida law.

76. KEMPER violated her duty of loyalty to ABT by engaging in self-serving business opportunities and taking interests in property in opposition to ABT as alleged above.

77. KEMPER violated her duty of care by failing to maintain the confidential nature of confidential information entrusted to her in her position as Senior V-P as alleged above.

78. KEMPER violated her duty of loyalty to ABT by taking advantage of corporate opportunities that rightfully belonged to ABT as alleged above.

79. KEMPER violated her duty of loyalty to ABT by acquiring an interest in one or more businesses adverse to that of ABT as alleged above.

80. KEMPER, individually or through GRANITE or K-CONSULTING, (a) used ABT's confidential information for their own benefit and disclosed the same to one or more competitors of ABT; (b) used ABT's customer data related data for their own benefit and caused

at least seven (7) customers of ABT to begin working with one or more competitors of ABT; (c) used ABT's confidential supplier data and pricing data, arranged or attempted to arrange that ABT's supplier make product and ship product to at least one ABT competitor; and (d) used pre-publication Invention data and, upon information and belief, disclosed the same to at least one competitor of ABT, enabling that competitor, upon information and belief, to get a jump start in the marketplace.

81.    Upon information and belief, KEMPER was compensated as a result of this breach of loyalty and of care.

82.    KEMPER's acts complained-of herein were intentional and willful.

83.    ABT has been monetarily damaged by KEMPER's breach of loyalty.

85.    ABT has been monetarily damaged by KEMPER's breach of her duty of care regarding ABT's confidential information.

86.    ABT has been irreparably harmed in that it cannot adequately be compensated for damages resulting from lost market share, diminution in pricing due to price wars with one or more competitors, delayed entry into certain distinct markets due to delays in regulatory approvals of product and labeling, and tarnished reputation in the marketplace.

87.    WHEREFORE, ABT seeks compensatory and consequential damages against KEMPER for breach of loyalty and breach of care, equitable relief in the form of disgorgement of all revenues and compensation received by KEMPER associated with this breach of loyalty and care, punitive damages, and injunctive relief against KEMPER for breach of loyalty and care.

### VIOLATIONS OF FLORIDA'S UNIFORM TRADE SECRET ACT (FUSTA), FLA. STAT. §688.001, et seq. BY KEMPER, GRANITE AND K-CONSULTING - Count III

88.     ABT repeats, re-alleges, and incorporates herein by reference as though fully set forth, all allegations contained in complaint Paragraphs 1 through 61, above.

89.     ABT's trade secret, confidential information includes its (a) product development data; (b) manufacturing data; (c) product testing data; (d) pre-publication patent data; (e) supplier data; (f) marketing data; (g) product pricing data; (h) customer data; (i) Passwords; and (j) Electronic Confidential Data stored on Electronic Devices and in online back-up files for the ABT-supplied iPhone (an Electronic Device).

90.     ABT employs reasonable efforts to maintain this trade secret, confidential information as a secret in that such trade secret, confidential information is not generally known and not being generally ascertainable by others as alleged above. These efforts include password controls on computers and data storage devices and the use of non-disclosure agreements.

91.     This trade secret, confidential information has economic value to ABT as demonstrated by its ongoing sales of BIOTAB7 product(s) and as shown by ABT's marketing plans and identification of untapped market segments and industrial uses of BIOTAB7 which represent future sales for the product.

92.     KEMPER had access to ABT's trade secret, confidential information. KEMPER knew that ABT's confidential information was trade secret, confidential information because ABT assigned passwords permitting her to access and operate ABT's computer system(s) and data and

because KEMPER signed the 2015 NDA and the 2017 NDA. KEMPER confirmed that promise of confidentiality in 2019.   See KEMPER's February 2019 email, Exhibit G.

93.     Upon information and belief, KEMPER, GRANITE and K-CONSULTING misappropriated ABT's trade secret, confidential information first by improperly acquiring and using the confidential information, knowing the same to be ABT's trade secrets, second by disclosing the same to third parties, including at least one direct competitor, and third by diverting several ABT customers to one or another ABT competitor in the marketplace, as alleged above.

94.     Upon information and belief, KEMPER, GRANITE and K-CONSULTING were compensated for misappropriating ABT's trade secret, confidential information.

95.     KEMPER's acts complained-of herein were intentional and willful.

96.     Upon information and belief, KEMPER owns, operates and directs the efforts of GRANITE and K-CONSULTING, hence GRANITE and K-CONSULTING's acts complained-of herein were intentional and willful.

97.     ABT has been monetarily damaged by KEMPER, GRANITE and K-CONSULTING due to misappropriation of ABT's trade secret, confidential information.

98.     ABT has been irreparably harmed by KEMPER, GRANITE and K-CONSULTING in that ABT cannot adequately be compensated for damages resulting from lost market share, diminution in pricing due to price wars with one or more competitors, delayed entry into certain markets due to delays in regulatory approvals of product and labeling, and tarnished reputation in the marketplace.

99.     WHEREFORE, ABT seeks compensatory damages and consequential damages against KEMPER, GRANITE and K-CONSULTING for misappropriation of ABT's trade secret, confidential information, equitable relief in the form of disgorgement of all revenues, compensation and unjust enrichment received by KEMPER, GRANITE and K-CONSULTING associated with this misappropriation, imposition of future royalties for use of pre-publication patent data, enhancement of damages due to the extraordinary misappropriation of trade secrets by Defendants, and injunctive relief against KEMPER, GRANITE and K-CONSULTING for such misappropriation.

## UNFAIR COMPETITION BY KEMPER, GRANITE AND K-CONSULTING (COMMON LAW VIOLATIONS) - Count IV

100.     ABT repeats, re-alleges, and incorporates herein by reference as though fully set forth, all allegations contained in complaint Paragraphs 1 through 61, above.

101.     Upon information and belief, KEMPER, GRANITE and K-CONSULTING engaged in acts of unfair competition to the detriment of ABT as follows: (a) using ABT's confidential information for their own benefit and disclosing the same to one or more competitors of ABT (including, but not limited to, product development data; manufacturing data; testing data; pre-publication patent data; supplier data; marketing data; pricing data; and customer data); (b) using ABT's customer data for their own benefit and diverting a number of ABT customers to one or more competitors of ABT; (c) tortiously interfering with ABT's relationship with its customers; (d) contacting ABT's supplier, using ABT confidential supplier data and pricing data, and arranging or attempting to arrange for such supplier to make and ship product to one or more ABT competitors; (e) tortiously interfering with ABT's relationship with its supplier(s) and/or its

24

manufacturer; (f) disclosing ABT's pre-publication Invention data to one or more ABT competitors; and (g) permitting such competitors with ABT's pre-publication Invention data to jump start competitive products in ABT's established markets and, upon information and belief, to jump start competitive products in ABT's identified, but not-yet-established markets.

102.    Upon information and belief, KEMPER, GRANITE and K-CONSULTING were compensated for these acts of unfair competition.

103.    KEMPER's acts complained-of herein were intentional and willful.

104.    Upon information and belief, KEMPER owns, operates and directs the efforts of GRANITE and K-CONSULTING, hence GRANITE and K-CONSULTING's complained-of acts were intentional and willful.

105.    ABT has been monetarily damaged by KEMPER, GRANITE and K-CONSULTING due to their acts of unfair competition.

106.    ABT has been irreparably harmed by KEMPER, GRANITE and K-CONSULTING in that ABT cannot adequately be compensated for damages resulting from lost market share, diminution in pricing due to price wars with one or more competitors, delayed entry into certain markets due to delays in regulatory approvals of product and labeling, and tarnished reputation in the marketplace.

107.    WHEREFORE, ABT seeks compensatory and consequential damages against KEMPER, GRANITE and K-CONSULTING for their acts of unfair competition, equitable relief in the form of disgorgement of all revenues, compensation and benefits received by KEMPER, GRANITE and K-CONSULTING associated with these acts of unfair competition, imposition of

future royalties for use of pre-publication patent data, punitive damages due to the scope and depth of these acts of unfair competition, and injunctive relief against KEMPER, GRANITE and K-CONSULTING.

**VIOLATIONS OF FLORIDA'S DECEPTIVE AND
UNFAIR TRADE PRACTICES ACT (FDUPTA), FLA. STAT. § 501.201 et seq.
BY KEMPER, GRANITE AND K-CONSULTING - Count V**

108.   ABT repeats, re-alleges, and incorporates herein by reference as though fully set forth, all allegations contained in complaint Paragraphs 1 through 61, above.

109.   Upon information and belief, KEMPER, GRANITE and K-CONSULTING engaged in the following acts of unfair and deception trade practices to the detriment of ABT as follows: (a) using ABT's confidential information for their own benefit and disclosing the same to one or more competitors of ABT (including, but not limited to, product development data; manufacturing data; testing data; pre-publication patent data; supplier data; marketing data; pricing data; and customer data); (b) using ABT's customer data for their own benefit and diverting a number of ABT customers to one or more competitors of ABT; (c) tortiously interfering with ABT's relationship with its customers; (d) contacting ABT's supplier, using ABT confidential supplier data and pricing data, and arranging or attempting to arrange for such supplier to make and ship product to one or more ABT competitors; (e) tortiously interfering with ABT's relationship with its supplier and/or its manufacturer; (f) disclosing ABT's pre-publication Invention data to one or more ABT competitors; and (g) permitting such competitors with ABT's pre-publication Invention data to jump start competitive products in ABT's established markets

and, upon information and belief, to jump start competitive products in ABT's identified, but not-yet-established markets.

110.    These aforementioned acts by KEMPER, GRANITE and K-CONSULTING violate the FDUTPA.

111.    Upon information and belief, KEMPER, GRANITE and K-CONSULTING were compensated for these deceptive and unfair acts of competition.

112.    KEMPER's deceptive and unfair acts complained-of herein were intentional and willful.

113.    Upon information and belief, KEMPER owns, operates and directs the efforts of GRANITE and K-CONSULTING, hence GRANITE and K-CONSULTING's deceptive and unfair acts complained-of herein were intentional and willful.

114.    ABT has been monetarily damaged by KEMPER, GRANITE and K-CONSULTING due to these deceptive and unfair acts of competition.

115.    ABT has been irreparably harmed by KEMPER, GRANITE and K-CONSULTING in that ABT cannot adequately be compensated for damages resulting from lost market share, diminution in pricing due to price wars with one or more competitors, delayed entry into certain markets due to delays in regulatory approvals of product and labeling, and tarnished reputation in the marketplace.

116.    WHEREFORE, ABT seeks compensatory and consequential damages against KEMPER, GRANITE and K-CONSULTING for their deceptive and unfair acts of competition, equitable relief in the form of disgorgement of all revenues, compensation and benefits received

by KEMPER, GRANITE and K-CONSULTING associated with these deceptive and unfair acts of competition acts, imposition of future royalties for use of pre-publication patent data, enhanced damages under FDUTPA due to the scope and depth of these deceptive and unfair acts of competition, and injunctive relief against KEMPER, GRANITE and K-CONSULTING.

## CONVERSION OF TANGIBLE PROPERTY BY KEMPER, GRANITE AND K-CONSULTING - Count VI

117.    ABT repeats, re-alleges, and incorporates herein by reference as though fully set forth, all allegations contained in complaint Paragraphs 1 through 61, above.

118.    ABT is the owner of certain tangible property, namely, certain telescope-operating computer equipment, software, hardware and cabling; a semi-precious Mexican wood desk, and a car.

119.    Prior to January 2020, these items of tangible property were placed in the possession and care of KEMPER.

120.    ABT has demanded return of this tangible property. See Exhibit H email.

121.    Upon information and belief, KEMPER, GRANITE and K-CONSULTING continue to possess the aforementioned tangible property.

122.    Upon information and belief, KEMPER, GRANITE and K-CONSULTING have no right to continue to possess the aforementioned tangible property.

123.    ABT has been deprived of the use of such tangible property and KEMPER, GRANITE and K-CONSULTING's continued possession the aforementioned tangible property is inconsistent with ABT's possessory rights.

124.    WHEREFORE, ABT seeks compensatory damages, disgorgement of profits, and other monetary relief against KEMPER, GRANITE and K-CONSULTING for their possession, use and conversion of ABT's tangible property, seeks injunctive relief against KEMPER, GRANITE and K-CONSULTING, and seeks partition of the car pursuant to Fla. Stat. §§ 64.091 and 64.011, et seq.

**CONVERSION OF ELECTRONIC DATA BY
KEMPER, GRANITE AND K-CONSULTING - Count VII**

125.    ABT repeats, re-alleges, and incorporates herein by reference as though fully set forth, all allegations contained in complaint Paragraphs 1 through 61, above.

126.    ABT is the owner of certain Electronic Devices (namely, ASUS and HP laptop computers and certain iPhones); Electronic Confidential Data stored on such Devices; and ABT electronic assets provided on other password-controlled electronic services, such as the GoDaddy hosted website, on social media accounts, on state and federal government agency platforms, and other ABT vendor platforms (airlines, banks, credit card processors, etc.). These password-controlled electronic services are only accessible with the use of Passwords earlier selected and used by KEMPER.

127.    While KEMPER was ABT's V-P, she was provided with laptop computers and cell phones (the Electronic Devices) to store and process ABT confidential data, herein, Electronic Confidential Data.

128.    Prior to January 2020, the Electronic Devices, Electronic Confidential Data and Passwords were placed in the possession and care of KEMPER.

129.    ABT has demanded return of these Electronic Devices, Electronic Confidential Data and Passwords. See Exhibits H and I.

130.    Prior to returning the ASUS and HP laptops (certain Electronic Devices), KEMPER wiped clean and deleted ABT's Electronic Confidential Data stored on those computers. Upon information and belief, these acts of deleting ABT's Electronic Confidential Data were deliberate and intentional because the deletion appears to be permanent.

131.    Upon information and belief, KEMPER, GRANITE and K-CONSULTING continue to possess a certain Electronic Device, namely an iPhone, Electronic Confidential Data and Passwords.

132.    Upon information and belief, KEMPER, GRANITE and K-CONSULTING have no right to continue to possess the Electronic Devices, Electronic Confidential Data and Passwords. KEMPER, GRANITE and K-CONSULTING have no right to dispossess ABT of its Electronic Confidential Data on the ASUS and HP laptops nor on the ABT-supplied iPhone (currently in KEMPER's possession), nor in any online iPhone backup service (such as an iCloud backup).

133.    ABT has been deprived of the use of the Electronic Device (iPhone), Electronic Confidential Data and Passwords and KEMPER, GRANITE and K-CONSULTING's continued possession the aforementioned property is inconsistent with ABT's possessory rights.

134.    WHEREFORE, ABT seeks compensatory damages, disgorgement of profits, and other monetary relief against KEMPER, GRANITE and K-CONSULTING for their possession,

use, and conversion of ABT's Electronic Devices, Electronic Confidential Data and Passwords, and seeks injunctive relief against KEMPER, GRANITE and K-CONSULTING.

### JURY DEMAND

135.    ABT requests a jury for this law suit.

### PRAYER FOR RELIEF

WHEREFORE, ABT demands judgment on Counts I – VII in this Complaint and an award of equitable relief and monetary relief, jointly and severally, against KEMPER, GRANITE and K-CONSULTING (collectively "Defendants") as follows:

a.    Entry of permanent injunctions pursuant to Federal Rule Civil Procedure 65 enjoining Defendants, their agents, representatives, servants, employees, and all those acting in concert or participation therewith, from (1) contacting ABT's suppliers, including but not limited to ABT's manufacturer of BIOTAB7 for a period of three (3) years; and (2) contacting ABT's customers for a period of three (3) years;

b.    Permanently enjoining Defendants from using ABT's confidential information including its (1) BIOTAB7 product development data; (2) BIOTAB7 manufacturing data; (3) BIOTAB7 testing data; (4) BIOTAB7 Invention patent data; (5) BIOTAB7 marketing data; and (6) BIOTAB7 pricing data;

c.    Permanently enjoining Defendants from using any ABT Electronic Confidential Data and any ABT Passwords;

d.    Permanently enjoining Defendants from using any ABT email data;

e.    An award of monetary damages against Defendants;

31

  f.  Disgorgement of profits and unjust enrichment due to Defendants' acts;

  g.  Enhanced damages as provided by FUTSA, Fla. Stat. 688.001, et seq., and FDUTPA, Fla. Stat. 501.201, et seq.;

  h.  An award of punitive damages;

  i.  An award of costs and reasonable attorneys' fees;

  j.  Partition of the car pursuant to Fla. Stat. § 64.011, et seq.; and

  k.  Such other and further relief as this Court deems just and proper.

Dated: _ Jan. 7 _____, 2021  /s/*RobertKain*_____

        Robert C. Kain, Jr.
        Florida Bar No. 266760
        rkain@conceptlaw.com
        Concept Law Group, P.A.
        6400 N. Andrews Ave., Suite 500
        Fort Lauderdale, Florida 33309
        Telephone: (754) 300-1500
        Facsimile: (754) 300-1501

VERIFICATION

I, Alexander Benisti, am Advanced Biocide Technology, LLC's managing member. I have read the complaint. The facts alleged in the complaint are true of my own knowledge, except as to those matters which are therein stated on information and belief, and, as to those matters, I believe it to be true.

Date 01 05 2021

Alexander Benisti

33